**ASBURY CENTER, AT JOHNSON CITY, Petitioner–Appellant,**

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID, Respondent–Appellee.**

No. 02–3438.

United States Court of Appeals, Sixth Circuit.

Oct. 2, 2003.

854

Before KEITH, COLE, and COOK, Circuit Judges.

## OPINION

COOK, Circuit Judge.

Asbury Center, at Johnson City (Asbury) challenges the government's determinations imposing civil money penalties

of $365,000 against Asbury for violations of Medicare participation requirements applicable to its long-term care facility. The Administrative Law Judge (ALJ) and the Department of Health and Human Services Departmental Appeals Board (DAB) both affirmed the administratively-imposed penalties. We likewise affirm.

## I.  Background

Asbury is a Medicare-certified residential nursing facility where Resident #1 (R1), restrained in a wheelchair, fell down a stairwell and died. In response to this incident, the Tennessee Department of Health, on behalf of the Secretary of the Department of Health and Human Services (Secretary), conducted a Medicare compliance survey and found violations of the federal Quality of Care and Administration regulations, constituting "immediate jeopardy" to Asbury residents. 42 C.F.R. §§ 483.25(h)(2), 483.75. The Secretary imposed a $5,000 per diem penalty until Asbury met "substantial compliance" with the program requirements. The penalty lasted twenty-eight days, totaling $140,000.

Two months later, Resident #2 (R2) also fell down a stairwell while restrained in a wheelchair and sustained a head laceration. The state agency conducted a second survey, finding repeated Quality of Care and Administration violations, in addition to a Physical Environment violation. § 483.70(c)(2). Since these violations again constituted "immediate jeopardy" to Asbury residents, the Secretary imposed a $7,500 per diem penalty and warned it would terminate Asbury's provider agreement the next month. The second penalty lasted thirty days, totaling $225,000. The Secretary cancelled the pending termination because Asbury returned to and maintained substantial compliance with the

program. Asbury appealed the Secretary's decision to the ALJ, and then to the DAB. Both affirmed the penalties the Secretary assessed. Asbury asks this court to reverse the penalties, or at minimum to reverse the decisions to assess at the higher "immediate jeopardy" penalty range. Asbury further asks that this court declare unreasonable the number of days penalized.

## II.  Regulatory Framework

To analyze Asbury's claims, we first review the pertinent aspects of the regulatory framework that underpins Medicare's oversight of long-term care facilities like Asbury. The Social Security Act sets forth requirements for health care providers participating in the Medicare and Medicaid program. The Act's regulations require nursing facilities to maintain "substantial compliance" with program requirements in order to participate. A facility is in substantial compliance when any deficiencies "pose no greater risk than the potential for minimum harm." 42 C.F.R. § 488.301. Following the death or serious injury of a resident, a facility must file an incident report with the Department of Health and Human Services or a state health agency, which prompts a survey of the facility to assess its program compliance. The state agency identifies deficiencies from the program requirements and reports those to the Secretary. The agency's report rates the deficiencies' seriousness on a four-point scale, ranging from the least serious finding of "no actual harm with a potential for minimum harm" to the most serious deficiencies constituting "immediate jeopardy to resident health or safety." § 488.404(b)(1). The Secretary may punish deficiencies by imposing a civil money penalty for each day that the facility is not in substantial compliance.[1] If the

---

1.  The Secretary must take the following factors into account in setting the amount of a     penalty:

violations constitute an "immediate jeopardy" deficiency, the Secretary may impose penalties ranging from \$3,050–\$10,000 per day, increasing in \$50 increments.[2] § 488.438(a)(1)(I). Otherwise, the potential penalties for less serious deficiencies range from \$50–\$3,000 per day. § 488.438(a)(1)(ii).

Once cited, a facility must correct its deficiencies so as to meet the program requirements. Only then will the Secretary find the facility in "substantial compliance." For nonisolated deficiencies, the deficient facility must submit a plan of correction before it can regain "substantial compliance" status. § 488.402(d). Upon submission of the correction plan, the Secretary authorizes the state agency to revisit the facility to verify implementation of the correction plan and determine whether the facility has returned to "substantial compliance," thus ending the penalty.[3] The facility may appeal the Secretary's penalty with an evidentiary hearing before an ALJ who may reduce, but may not set aside, the penalty. § 488.438(e). The ALJ must uphold the Secretary's determinations as to the level of noncompliance unless they are clearly erroneous. § 498.60(c)(2). The facility can then request that the DAB review the decision. The DAB may adopt, modify, or reject the

ALJ's decision based on the record's evidence. §§ 498.80, 498.88. The DAB's decision becomes the Secretary's final decision and may be appealed to the United States Court of Appeals. § 498.80(a)(1).

## III. ANALYSIS

### A. Standard of Review

This court accepts as conclusive the Secretary's findings of fact if "supported by substantial evidence on the record considered as a whole." 42 U.S.C. § 1320a–7a(e). And, we substantially defer to an administrative agency's interpretation of its own regulations. *A.D. Transport Express, Inc. v. United States,* 290 F.3d 761 (6th Cir.2002) (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). When reviewing the legal propriety of a civil monetary penalty, this court may affirm, set aside or remand the order. 42 U.S.C. § 1320a–7a(e). We review the Secretary's penalties for an abuse of discretion. *S. Valley Health Care Ctr. v. Health Care Fin. Admin.,* 223 F.3d 1221, 1223 (10th Cir.2000).

### B. Program Compliance

#### 1. Quality of Care Requirement

■ Medicare's "quality of care" requirement demands that each resident re-

---

(1) The facility's history of noncompliance, including repeated deficiencies.
(2) The facility's financial condition.
(3) The factors specified in § 488.404.
(4) *The facility's degree of culpability. Culpability* for purposes of this paragraph includes, but is not limited to, neglect, indifference, or disregard for resident care, comfort or safety. The absence of culpability is not a mitigating circumstance in reducing the amount of the penalty.
42 C.F.R. § 488.438(f). Section 488.404 in turn sets forth factors to be considered in selecting remedies. The various factors that the regulation lists involve assessing the seriousness of the deficiency; the deficiency's relation to other deficiencies resulting in non-

compliance; and the facility's prior history of noncompliance. § 488.404.

**2.** Immediate jeopardy is defined as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301.

**3.** *See* State Operations Manual, Appendix P: Survey Protocol for Long Term Care Facilities, Part I: Survey Procedures for Long Term Care Facilities, Section VI: Post Survey Revisit (Follow–Up), p. P–73; Chapter 7—Survey and Enforcement Process for SNFs and NFs, pp. 7–39 to 7–40 (attached to Respondent's Brief at Addendum B).

ceive, and that all facilities provide, "the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the resident's comprehensive assessment and plan of care." 42 C.F.R. § 483.25. Specifically, the facility must provide an environment as free from accident hazards as possible and in which residents receive adequate supervision and assistance to prevent accidents. § 483.25(h). In reviewing the cited lapses of Asbury in the quality of care of R1, we look to the ALJ's findings for evidence supporting the violations and find that R1 had a well-documented history of wandering, including a similar falling incident that resulted in a less serious injury. Asbury knew that R1 had poor balance and a propensity to wander, coupled with "severely impaired" decision-making abilities. Despite a plan of care requiring that the staff observe her frequently and place her in a supervised area, the ALJ found R1 was left unobserved for at least twenty, and perhaps thirty-five, minutes on a day when approximately 400 visitors were on Asbury's grounds for a picnic. In comparing the quality of Asbury's care to Medicare's requirement, the ALJ stated that "[a]t a minimum, 'adequate supervision under the circumstances' requires that entire corridors not be left unsupervised for indefinite periods of time, particularly when occupied by a resident whose wandering behavior presents known safety hazards to herself and others." J.A. at 658. The ALJ also found that Asbury knew of R2's history of wandering in and out of doors, stairwells, and elevators. It was because Asbury knew of this tendency that it moved her to a secure floor where she was issued an electronic alarm bracelet designed to sound if she approached a door or boarded an elevator. Asbury acknowledged it did not test the alarm system for ten days before R2's accident, despite its own policy and the manufacturer's recom-

mendation to test the alarm system weekly. The ALJ noted that, while the alarm system's failure may have been unique and unusual at Asbury, "the system was never meant to be fail-safe and certainly did not substitute for the presence of adequate staff." J.A. at 662. The record again showed evidence of inadequate staffing: two nursing assistants were off the floor during R2's fall and the one remaining nurse was unable to monitor R2 as closely as was necessary.

We conclude that the ALJ's findings are supported by substantial evidence demonstrating unmonitored corridors and unsupervised, wandering residents. These findings are sufficient to uphold the quality of care violation against Asbury.

## 2. Administration Requirement

■ Medicare's "administration" requirement states: "A facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, psychosocial well-being of each resident." 42 C.F.R. § 483.75. An administrative deficiency is a derivative finding, based on the presence of other deficiencies. Deferring to the agency's interpretation of its own regulation, a finding of inadequate supervision, supported by substantial evidence on the record, requires that we affirm the administrative violations. The ALJ found that lack of supervision endangered R1 in two prior incidents, and in the instant case caused R1's death. She also found Asbury's policy allowing all nursing assistants to leave the floor at the same time sanctioned inadequate resident supervision and contributed to R2's fall.

We agree with the ALJ's conclusion that since the noncompliance was serious enough to place residents in immediate jeopardy, the facility was not administer-

ing its resources effectively to optimize resident well-being. Given the evidence supporting these findings and the deference we accord to the agency in applying its own rules, we uphold the finding that Asbury violated Medicare's administrative requirement.

### 3. Physical Environment Requirement

■ Medicare's "physical environment" requirement demands that a facility maintain all essential mechanical, electrical, and patient care equipment in safe operating condition. 42 C.F.R. § 483.70(c)(2). The record contains undisputed evidence that Asbury's own policy required weekly testing of resident security transmitters, as did the manufacturer's maintenance instructions. Asbury's failure to test the system for ten days before R2's fall provides substantial evidence to support the ALJ's finding. We affirm the finding that Asbury violated Medicare's physical environment requirement.

### C. The Duration of the Penalties

■ Asbury argues that the penalties' duration exceeded the period of noncompliance, or alternatively, that the existing noncompliance did not place residents in "immediate jeopardy." Asbury contends that once it repaired the damaged door and tested the faulty security system the Secretary should have reduced or discontinued the penalties. Not only does this argument ignore that inadequate staffing was also a basis of Asbury's violations, it disregards the regulation's general requirement that the state agency revisit the facility to conduct a follow-up survey before declaring that a facility has returned to "substantial compliance." It was within the Secretary's discretion to require the second survey to verify the implementation of the corrective measures. We may only reverse if we are left with a definite and firm conviction that the Secretary committed a clear judgment error in reaching its

conclusion after weighing the relevant factors. *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir.2002). Given that staffing shortcomings and the necessity to revisit the facility to confirm compliance support the Secretary's decision here, we find no abuse of discretion in the setting the penalties' duration.

### D. The Amount of the Penalties

■ Finally, Asbury argues that the amount of the penalties is arbitrary and unlawful under the statutory regulation. We reject Asbury's contention and affirm the penalties assessed regarding each incident. Given the record evidence demonstrating lack of supervision, inadequate staffing, and failure to maintain the security system as required, viewed in light of two serious accidents that injured and killed residents, the Secretary acted reasonably in finding that these deficiencies put Asbury's residents' health and safety in "immediate jeopardy." The $5,000 penalty the Secretary assessed after the first incident is in the lower range of possible "immediate jeopardy" penalties. The $7,500 penalty imposed following the second incident reflects not only the short time frame between two "immediate jeopardy" findings, but also the presence of multiple, repeated, and serious program violations. These considerations support both the assessing of a civil monetary penalty under the regulation, and the amounts assessed. We affirm the penalties as imposed.

### IV. CONCLUSION

Substantial evidence from the ALJ's findings support the DAB's decision and we thus affirm that decision.