*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CLAIBORNE-HUGHES HEALTH CENTER,
                              *Petitioner,*

                    *v.*

KATHLEEN SEBELIUS, Secretary of the United
States Department of Health and Human
Services; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
                              *Respondents.*

No. 09-3239

———————————

On Petition for Review of a Final Decision of the Department
of Health and Human Services Departmental Appeals Board.

Decision No. 2223

Decided and Filed: June 25, 2010

Before: KEITH, CLAY, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ON BRIEF:** Julie B. Mitchell, Philip J. Chapman, COPELAND, COOK, TAYLOR &
BUSH, P.A., Ridgeland, Mississippi, for Petitioner. Carol W. Napier, OFFICE OF THE
GENERAL COUNSEL, Atlanta, Georgia, for Respondents.

———————————

## OPINION

———————————

KEITH, Circuit Judge. Claiborne-Hughes Health Center ("Claiborne") is a skilled
nursing facility in Franklin, Tennessee that participates in the federal Medicare program.
The United States Department of Health and Human Services requires facilities that
participate in the Medicare or Medicaid programs to comply with certain minimum standards
of care. Inspections completed in August and September of 2006 revealed that Claiborne

1

was noncompliant with a number of these standards. Based upon those findings, the United States Centers for Medicare and Medicaid Services ("CMS") imposed a civil money penalty ("CMP") and a denial of payment for new admissions ("DPNA"). These sanctions were sustained by an administrative law judge ("ALJ") on the basis of one finding of noncompliance from each inspection, although both inspections found multiple instances of noncompliance. With some adjustments, the ALJ's findings were affirmed by the Appellate Division of the Departmental Appeals Board ("DAB"). Claiborne appeals, and for the following reasons, we affirm.

## I. Facts

Although the administrative proceedings encompassed a wide range of factual issues, this appeal is focused on the care Claiborne provided to two of its residents, Resident 4 ("R4") and Resident 4a ("R4a"). R4, a male resident, was admitted to Claiborne in September 2004 with a diagnosis that included diabetes, dementia, and depression. Totally dependent on Claiborne staff, he could not eat or drink without assistance, could not chew solid food, and had difficulty swallowing pureed food and thickened liquids. Because of these conditions, Claiborne determined that R4 was at risk for malnutrition, dehydration, and weight loss. Accordingly, R4s care plan contained several interventions. These included maintaining daily records of his food consumption and fluid intake; spoon-feeding him his meals, which consisted of pureed food; helping him to drink thickened liquids; and providing nutritional supplements.

On June 13, 2006, R4s weight was recorded as 135 pounds. By late June and through the first half of July, R4s diet flow sheets indicate that his food intake decreased markedly. The next time Claiborne weighed R4, on July 18, his weight was recorded as 116.5 pounds, revealing a loss of 18.5 pounds during this five-week period. The weight loss was reported to Claiborne's dietary manager, who then instructed the staff to re-weigh R4. A few days earlier, on July 13, R4's doctor visited R4, and during that visit discussed aspects of R4's condition with Claiborne staff members.

On the afternoon of July 19, before he was re-weighed, R4 was unresponsive and in respiratory distress. Claiborne then contacted his family and his doctor, and R4 was

immediately transferred to a hospital where his weight was recorded as 110 pounds. He died on July 20, 2006.

The second incident involves Claiborne's care of R4a, a female resident. As of August 30, 2006, R4a had been placed on Claiborne's "Focused Hydration List," indicating that Claiborne was to provide R4a with extra fluids in order to help treat her urinary tract infection. However, R4a's diet flow sheets for August 30, August 31, and September 1, 2006 failed to show that her fluid intake even met her estimated daily need of 1500 cubic centimeters.

## II.  The Regulatory Landscape

To be eligible for reimbursement for services provided to patients under the federal Medicare and Medicaid programs, skilled nursing facilities must comply with the requirements set forth in 42 U.S.C. § 1395i–3 and 42 C.F.R. §483.1 et seq. To determine compliance, the Secretary of the United States Department of Health and Human Services ("Secretary") contracts with state agencies to conduct inspections known as surveys. 42 C.F.R. § 488.10. During the surveys, the state agency records any noncompliance that it discovers and notes its severity. *Id.* § 488.404(b). The severity categories range from the lowest, "[n]o actual harm with a potential for minimum harm," to the highest, noncompliance that causes "immediate jeopardy to resident health or safety." *Id.* Instances of noncompliance are called "deficiencies." *Id.*

The regulations define "immediate jeopardy" as a situation where the noncompliance "has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. Such a finding exposes the Medicare provider to a CMP ranging from $3,050 to $10,000 per day. *See id.* §§ 488.408(e)(2)(ii), 488.438(a)(1)(i). CMS may impose CMPs ranging from $50 to $3,000 per day for deficiencies of lesser severity that are substantial but do not reach the immediate jeopardy level. *Id.* § 488.438(a)(1)(ii).

## III. The Administrative Proceedings

The Tennessee Department of Health began a survey of Claiborne in the summer of 2006. The initial survey was completed on August 14, 2006, and follow-up surveys were completed on September 6 and October 11 of the same year. The August survey found

seven deficiencies that reached the immediate jeopardy level. Based upon these findings, CMS imposed a CMP of $3,050 per day, effective July 18, 2006. CMS also imposed a DPNA effective August 20, 2006. The follow-up September survey found that the immediate jeopardy level of noncompliance had been rectified. This finding ended the imposition of the $3,050 per day penalty on September 4, 2006. However, three additional deficiencies remained. CMS therefore imposed a $100 per day CMP, effective September 5, 2006, and kept the DPNA in effect. The October survey found that Claiborne was in substantial compliance with all regulations as of September 18. The $100 per day CMP and the DPNA accordingly ended on September 17, 2006.

Claiborne filed an administrative appeal challenging the survey's immediate jeopardy and noncompliance findings. The ALJ accumulated a voluminous record consisting of documentary evidence and extensive briefing by both parties. Although the August survey found seven deficiencies, the ALJ upheld the immediate jeopardy level CMP by addressing only the care of R4. Because CMS imposed the minimum $3,050 penalty here, the presence of only one such immediate jeopardy level deficiency would be sufficient to sustain the penalty amount. In upholding CMS's decision, the ALJ concluded that Claiborne's failure to immediately contact R4s family and doctor regarding the change in his condition resulted in noncompliance with 42 C.F.R. § 483.10(b)(11), which provides in pertinent part:

> *Notification of changes.* (i) A facility must immediately . . . consult with a resident's physician; and . . . notify the resident's legal representative or an interested family member when there is - . . . (B) A significant change in the resident's physical, mental, or psychosocial status (i.e., a deterioration in health, mental, or psychosocial status in either life-threatening conditions or clinical complications).

The ALJ agreed with the August survey's finding that Claiborne's noncompliance with §483.10(b)(11) had put the health and safety of R4 and the other residents in immediate jeopardy. The ALJ also agreed that Claiborne did not prove that it corrected this noncompliance before September 5, 2006, and upheld the $3,050 per day CMP and the DPNA remedies in full.

Claiborne appealed the ALJ's decision to the DAB, which upheld the ALJ's decision as to the $3,050 per day CMP and the DPNA on substantially similar grounds. The DAB

agreed with CMS and the ALJ that R4s food intake diminished sharply in June and July. It also agreed that prior to July 13, when Claiborne spoke with R4s doctor, Claiborne should have recognized that R4s decreased food intake constituted a significant change. The DAB also agreed that because Claiborne had not properly notified R4s family or doctor about the significant change in his condition, it failed to comply with §483.10(b)(11), and the deficiency reached the immediate jeopardy level of severity.

In his initial decision, the ALJ also upheld the $100 per day CMP spanning September 5 through September 17, 2006. The DAB overturned this CMP and remanded back to the ALJ, who upheld the CMP on other grounds that were again rejected by the DAB on appeal. After rejecting this second CMP, the DAB eschewed another remand to avoid delay, and itself reviewed the September survey's finding of noncompliance in relation to Claiborne's care of R4a. In so doing, it reviewed the finding under the *de novo* standard that the ALJ would have applied.

The September survey concluded that Claiborne's failure to properly document its hydration procedures in R4a's case resulted in noncompliance with 42 C.F.R. § 483.25(j), which required Claiborne to "provide each resident with sufficient fluid intake to maintain proper hydration and health." The DAB further agreed that although the potential for harm was more than minimal, the noncompliance did not rise to the level of immediate jeopardy. As a result, a CMP of $50 per day was imposed from September 5, 2006 to September 17, 2006, which is the minimum penalty allowed under the regulation. After this final review by the DAB, Claiborne filed this petition for review.

Claiborne challenges four of the DAB's conclusions: that it failed to notify R4's family and doctor when there was a significant change in his condition, causing noncompliance with 42. C.F.R. § 483.10(b)(11); that its noncompliance with this regulation put the residents in immediate jeopardy; that it failed to provide sufficient fluid intake to its residents in compliance with 42 C.F.R. § 483.25(j); and that the ALJ had the discretion to decline to address the other deficiencies found in the survey results.

## IV.  Analysis

### A. Standard of Review

Judicial review of an order imposing a civil monetary penalty is governed by 42 U.S.C. § 1320a-7a.  "Any person adversely affected by a determination of the Secretary may obtain a review of such determination in the United States Court of Appeals for the circuit in which the person resides . . ."  42 U.S.C. § 1320a-7a(e).

The statute also provides that the DAB's findings of fact are subject to substantial evidence review.  *Id.*  When conducting substantial evidence review, this Court examines the record as a whole and takes into account whatever in the record fairly detracts from the weight of the evidence below.  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  This is a highly deferential standard.  *Woodstock Care Ctr. v. Thompson,* 363 F.3d 583, 588 (6th Cir. 2003).  This Court does not "consider the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Myers v. Sec'y of Health & Human Servs.,* 893 F.2d 840, 842 (6th Cir. 1990).  Instead, the reviewing court must "ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion."  *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted).  Or, in other words, whether, on the record under review, "it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, 366-67 (1998).  As a result, substantial evidence review "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder."  *Id* at 377.

Also, "[i]n reviewing the Secretary's interpretation of [the] regulations, courts may overturn the Secretary's decision only if it is 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.'" *St. Francis Health Care Ctr. v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).  "Further, courts are to 'give substantial deference to an agency's interpretation of its own regulations.'" *Id.* (quoting *Thomas Jefferson Univ.,* 512 U.S. at 512).  "In sum, if 'it is a reasonable regulatory interpretation . . . we must defer to it.'" *Id* at 944 (quoting *Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 94-95 (1995)) (alteration in original).

**B. 42 C.F.R. § 483.10(b)(11)**

A skilled nursing facility "must immediately inform the resident; consult with the resident's physician; and if known, notify the resident's legal representative or an interested family member when there is . . . a significant change in the resident's physical, mental, or psychosocial status (i.e., a deterioration in health, mental, or psychosocial status in either life-threatening conditions or clinical complications)."  42 C.F.R. §483.10(b)(11).  This requirement is  not limited to situations that are deemed life-threatening or an emergency. *NHC Healthcare Athens v. Centers for Medicare & Medicaid Services (CMS)*, DAB No. 2258, at 8-9 (2009).  Instead, the regulation requires consultation with the physician whenever there is a chance that physician intervention is needed.  *Laurels at Forest Glenn v. Centers for Medicare & Medicaid Services (CMS)*, DAB No. 2182, at 12-13 (2008). Moreover, the DAB has made it clear that the regulation does not allow a nursing home to delay consulting the resident's physician once a significant change has occurred.  *See Magnolia Estates Skilled Care v. Centers for Medicare & Medicaid Services (CMS)*, DAB No. 2228, at 8-9 (2009).

The DAB found that R4 suffered a significant change in his physical condition in late June and early July 2006, as his food intake declined sharply.  When R4 was initially admitted as a resident, Claiborne decided that his food intake was to be closely monitored because he was at high risk for malnutrition.  It follows logically that a sharp decline in food intake would greatly increase R4s risk of malnutrition, and thus constitute a significant change under the regulation.  This significant change triggered the § 483.10(b)(11) requirement to notify R4s doctor and family.

Appellant argues against the significant change finding because the DAB failed to point to a specific benchmark or date on which the significant change occurred.  However, even if one accepts Claiborne's characterization of its interaction with R4s doctor on July 13 as the consultation required by § 483.10(b)(11), it was reasonable for the DAB to find that the significant change happened well before then.  Given R4s known vulnerability to malnutrition, three weeks of significantly depressed food intake is certainly more than sufficient to constitute a significant change.  By July 13, 2006, R4 had been eating poorly

for at least three weeks. The DAB therefore reasonably concluded that no specific date or benchmark is needed to find that a significant change occurred here.

Appellant also argues that R4s drop in food intake was not a significant change because his food intake was sporadic throughout his entire stay at Claiborne. The DAB addressed this argument, explaining that the fact that a resident has experienced a condition previously does not make the recurrence of the condition insignificant. The DAB has also rejected similar arguments in the past. *See, e.g., NHC Healthcare Athens,* DAB 2258 at 6 (2009) (noting that the existence of a condition does not preclude a regulation's requirement to contact the physician upon the condition's recurrence). Indeed, the DAB's regulatory interpretation here is reasonable given that many residents seek admission into skilled nursing facilities in the specific hopes of preventing the recurrence of past life-threatening health episodes.

Claiborne next argues that R4s contact with his doctor on and before July 13 constituted the consultation required under § 483.10(b)(11), but the DAB reasonably addressed this argument also. It found nothing in the record to suggest that R4s doctor was kept abreast of R4s lengthy period of decreased food intake at any time between June 19 and July 13. Even assuming, *arguendo*, that Claiborne did properly consult the doctor, its failure to notify the family at any point during this period, or even more egregiously on July 13 when R4s final decline was noted, effectuated noncompliance with the regulation. Finally, when Claiborne learned on July 18 that R4 had lost 18.5 pounds, an amount Claiborne concedes constituted a significant change, it failed to immediately contact either R4s doctor or family. Instead, Claiborne waited until July 19 when R4 was in respiratory distress and unresponsive. Such conduct is clearly noncompliant with the § 483.10(b)(11) mandate to immediately consult the resident's physician and notify the resident's family.

Finally, Claiborne argues that the weight loss was not visible at any time before R4s weighing on July 18, and that it was not caused by the steep decline in food intake over the course of more than three weeks, but instead it happened nearly overnight as a result of R4s diabetes. However, the DAB's findings of fact on both of these issues are supported by substantial evidence. As stated above, under the substantial evidence standard, this court does not "consider the case *de novo*, nor resolve conflicts in the evidence, nor decide

questions of credibility." *Myers v. Sec'y of Health & Human Servs.,* 893 F. 2d at 842. Instead, we "ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion." *Dickinson*, 527 U.S. at 162.

The expert testimony accumulated by the ALJ indicates that a steep decline in food intake over the course of this time period could lead to the resultant loss in weight. Moreover, if R4 had shed over 18 pounds in 24 hours, staff members would have observed extreme symptoms related to fluid depletion and would have noted them. Granting that the weight loss reasonably could have taken place over the course of a few weeks and not a few hours, the DAB also correctly concluded that the weight loss did not need to be visibly observable on R4s person. One of the primary objects of closely monitoring R4's food intake would be to observe his food intake and respond when a sharp decline would likely result in malnutrition. The weight loss presumably was a proxy for malnutrition. The DAB correctly noted that a sharp decline in food intake persisting for over three weeks should have brought R4s significant change in status to Claiborne's attention. As a result, it is clear that Claiborne failed to achieve substantial compliance with 42 C.F.R. § 483.10(b)(11).

## C. Immediate Jeopardy

"Immediate jeopardy" is defined as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. The DAB has held that 42 C.F.R. § 498.60(c)(2) "places the burden on the [skilled nursing facility] - a heavy burden, in fact - to upset CMS's finding regarding the level of noncompliance." *Liberty Commons Nursing & Rehab Ctr. v. Centers for Medicare & Medicaid Services (CMS)*, DAB No. 2031 at 18 (2006) (emphasis omitted). The DAB correctly concluded that the appellant failed to meet this heavy burden.

There is substantial evidence in the record suggesting that R4 likely suffered serious harm when the Claiborne staff failed to comply with 42 C.F.R. § 483.10(b)(11). It was well known that a decrease in food consumption would pose significant risks to R4s health. The appellant offered no testimony contradicting that claim. Instead, Claiborne makes several arguments citing the futility of any intervention, arguing that without a feeding tube there was nothing the staff could have done to prevent R4s decline, and reiterating that in the past

the family had refused the insertion of a feeding tube. However, as pointed out by the DAB, it is not possible to determine whether more timely intervention by the staff, more timely consultation with the resident's physician, or more urgent requests to the family for feeding tube insertion might have prolonged the resident's life. Claiborne was not being paid to simply warehouse R4 until his death, but to provide care. Thus, the immediate jeopardy determination was not in clear error.

**D. 42 C.F.R. § 483.25(j)**

Under federal law, "[t]he facility must provide each resident with sufficient fluid intake to maintain proper hydration and health." 42 C.F.R. § 483.25(j). Substantial evidence in the record as a whole suggests that the staff was not sufficiently knowledgeable concerning Claiborne's policies and procedures for ensuring that residents received adequate hydration, nor was the staff implementing those policies and procedures on a consistent basis. Claiborne's care of R4a illustrates this point.

R4a was a resident who had been targeted for increased hydration. The September survey found that R4a's fluid intake did not meet her estimated daily fluid needs. In addition, Claiborne staff did not follow its own policies as to monitoring the residents' hydration generally. Claiborne's guidelines state that a night shift supervisor should "calculate total resident intake . . . to determine resident hydration compliance and needs." Of the 22 residents reviewed in the survey, the surveyor found that 20 lacked full documentation of fluid intake.

In response, Claiborne argues that the regulations do not require it to keep such tallies. However, as the DAB pointed out, once a facility chooses a method of assuring sufficient fluid intake, it cannot complain about the surveyor's reliance on the facility's chosen methods. More specifically, because Claiborne had not implemented the system of fluid monitoring that it had itself chosen, the surveyor had no other way of determining whether the *ad hoc* method adopted by the staff was reliably providing sufficient fluid intake for the residents. As a result, substantial evidence exists in the record as a whole to demonstrate that Claiborne-Hughes had failed to substantially comply with 42 C.F.R. § 483.25(j).

**E. Unreviewed Deficiencies**

As stated above, although Claiborne appealed all seven deficiencies in the August survey, the ALJ and later the DAB concluded that it needed to address only one of the deficiencies in order to uphold the CMP and DNPA. Claiborne argues that this is unfairly prejudicial because the other unreviewed deficiencies will remain in its public record. Indeed, as some deficiencies found during the September survey were later overturned upon review, Claiborne understandably has trepidation in regards to the other remaining deficiencies which, though unreviewed, will remain on the public record. As a result, Claiborne requests that this Court either direct the ALJ or the DAB to review these remaining deficiencies, or dismiss the remaining unreviewed deficiencies outright.

We will do neither. The DAB has consistently interpreted the regulations to mean that the ALJ is not mandated to address each and every deficiency found in a survey, and it may choose to address only those deficiencies that have a material impact on the outcome of the dispute. *See W. Care Mgmt. Corp. v. Ctrs. for Medicare & Medicaid Servs.,* DAB No. 1921, at 36 (2004). As stated above, courts are to "give substantial deference to an agency's interpretation of its own regulations." *St. Francis*, 205 F.3d at 943 (internal quotation marks omitted). It is neither arbitrary nor capricious for the agency to conclude that, in the interests of judicial economy, it will review only those deficiencies that have a material impact on the outcome of the dispute.

As a result, once the ALJ determined that the deficiencies concerning R4 and R4a sufficed to support the imposition of sanctions, he was free, in the interests of judicial economy, not to continue making additional rulings. As we find no error in the ALJ's noncompliance findings, this court is not bound to rule on the other aspects of the survey results.

**V.**

For the reasons stated above, we **AFFIRM.**