**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1086n.06

No. 11-3161

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Oct 18, 2012*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SOMERSET NURSING AND REHABILITATION FACILITY, | ) ) ) | |
| Petitioner, | ) ) | ON PETITION FOR REVIEW FROM THE DEPARTMENTAL |
| v. | ) ) ) | APPEALS BOARD OF THE UNITED STATES DEPARTMENT |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, | ) ) ) ) ) | OF HEALTH AND HUMAN SERVICES |
| Respondents. | ) ) ) | |

**Before: SILER, DAUGHTREY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Petitioner Somerset Nursing and Rehabilitation Facility ("Somerset") petitions this court for review of the decisions of the Departmental Appeals Board ("DAB") and Administrative Law Judge ("ALJ") upholding the Secretary of the United States Department of Health and Human Services' ("Secretary") imposition of a monetary penalty for Somerset's failure to comply with 42 C.F.R. §§ 483.13(b) and (c). We affirm in part and reverse in part.

**I.**

Somerset is a skilled-nursing home facility in Kentucky that participates in the Medicare program. On February 6, 2008, Somerset admitted Resident #9, a 5'11", 199 pound, 85-year-old

male resident who was generally alert but also had been diagnosed with dementia, chronic renal failure, congestive heart failure, chronic obstructive pulmonary disease, diabetes mellitus, and depression. Resident #9 usually moved about Somerset in a wheelchair; however, he was able to walk occasionally. Resident #9 was placed in Somerset partially because his family was concerned that he made sexual advances towards his wife, who no longer recognized him due to her dementia. After Resident #9's admission to Somerset, he began making unsolicited sexual advances toward some of the female residents. Somerset's records show the following:

April 10, 2008: Brushed up against a cognitively-impaired female in the hallway

May 10, 2008: Found in room of severely cognitively impaired female resident "feeling of her." (Although this description was included in Somerset's behavior logs, Somerset's internal investigation notes state that staff "observed [Resident #9] reaching towards [resident's] shirt but did not observe direct contact.")

May 18, 2008: Touched cognitively impaired female resident at several places on her body. (Although this description was included in Somerset's behavior logs, Somerset's internal investigation notes state "staff observed [Resident #9] reaching towards [resident's] arms, chest and abdomen areas . . . No one substantiated contact occurred between Residents.")

May 22, 2008: Made inappropriate sexual advances toward female resident and did not stop when asked.

May 28, 2008: Made sexual advances toward female resident and tried to get into the female resident's room.

May 29, 2008: Found in room of resident whom he had made sexual advances toward the previous day and resident complained that he tried to touch her inappropriately.

May 30, 2008: Made sexual advances toward female resident.

June 18, 2008: Made sexually suggestive remarks towards female resident.

2

July 8, 2008:   Kissed and fondled breast of cognitively impaired female resident. (Although this description was included in Somerset's behavior logs, Somerset's internal investigation notes state "[s]taff observed [Resident #9] pursing his lips in a kissing fashion towards [resident].   Both residents were in wheelchairs and proximity was not close enough for [Resident #9] to make contact with his lips.   As staff approached to intervene, [Resident #9] was observed reaching towards her chest area.")

August 21, 2008:   Forcefully pinched right breast of female resident.

August 22, 2008:   Found in female resident's room sitting by her bed.

August 22, 2008:  Found holding onto the shirt of a female resident that was partially undone.

August 23, 2008:   Found reaching for a female resident's breast.

August 23, 2008:   Found in doorway of female resident's room.

October 16, 2008:   Witnessed grabbing breast of Resident #10 who has dementia.

December 10, 2008:   Invited a female resident into his room.

Resident #9 had a history of making uninvited sexual advances towards women and had been asked to leave several nursing homes prior to his admission to Somerset.  The staff first spoke with Resident #9 after the April 10, 2008 incident and discussed the need to respect the other residents' "personal space."  Although the staff interviewed the female resident involved, she was unable to express any concern about her interaction with Resident #9 due to her cognitive impairment.

After the incident on May 10, 2008, Somerset had a "teachable moment," resulting in staff members being instructed to monitor Resident #9.  The Director of Nursing also interviewed the female resident involved.  The resident was unable to describe what had transpired because of her cognitive impairment; however, the Director of Nursing did not note any adverse effects from this

3

incident. On May 16, 2008, a psychiatric physician's assistant consulted with Resident #9 regarding his behavior.

After the incident on May 18, 2008, Somerset advised Resident #9 to stay away from all female residents and informed its staff to observe Resident #9 "at all times." However, this instruction did not result in constant monitoring of Resident #9. Further intervention methods included encouraging Resident #9's family members to visit and again instructing staff members to monitor him after the May 22, 2008 incident, as well as having another psychiatric consultation, involving Resident #9 in diversionary tactics such as gardening, and threatening discharge, after the May 29, 2008 incident. After the incident on July 8, 2008, Somerset advised fourteen staff members that Resident #9 would be on fifteen-minute checks. Somerset also warned Resident #9 and his family that he would be discharged if his behavior continued.

After Resident #9 forcefully pinched the breast of a female resident on August 21, 2008, he began weekly meetings with social services to discuss his behavior. Somerset's staff members were again instructed to monitor Resident #9 and keep him away from the female residents. On September 12, 2008, Somerset held a faculty-wide in-service on abuse, although there is no record that Resident #9's behavior was discussed at this time.

Somerset decided it had exhausted all possible intervention methods after the October 16, 2008 incident and initiated discharge proceedings. Somerset's staff members were also further instructed to monitor Resident #9 and prevent him from approaching female residents. Resident #9's family appealed the discharge and Somerset was forced to keep Resident #9 at its facility pending the appeal. Between January 7, 2009 and January 9, 2009, Somerset implemented additional

4

intervention in the form of one-on-one monitoring of Resident #9.  On January 9, 2009, Resident #9 was finally discharged from Somerset.

In the interim, the Kentucky Cabinet of Health and Family Services conducted two recertification surveys at Somerset, one from January 5- 9, 2009, and another on January 26, 2009. According to the surveys, Somerset was not in substantial compliance with eleven regulatory requirements, eight of which posed immediate jeopardy.  Two of Somerset's deficiencies that posed immediate jeopardy pertained to Somerset's handling of Resident #9's behavior towards the other residents.  Specifically, Somerset was found in violation of 42 C.F.R. § 483.13(b) for failing to protect its residents from sexual abuse and in violation of 42 C.F.R. § 483.13(c) for failing to implement its abuse policy in six of the seven required components for long-term care facilities, training, prevention, identification, protection, reporting and response.

Based on Somerset's conduct, the Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("DHHS"), imposed a civil monetary penalty ("CMP") of $3,050 per day from May 10, 2008 - January 14, 2009, the lowest penalty that can be assessed upon a finding of immediate jeopardy.  *See* 42 C.F.R. § 488.438(a)(1)(i). CMS also imposed a CMP of $150 per day from January 15, 2009 - January 29, 2009, which Somerset does not appeal here.

Somerset appealed the penalty to the DHHS Departmental Appeals Board.  The ALJ held a telephonic hearing on March 22, 2010 and issued a decision on June 24, 2010.  In his decision, the ALJ only addressed two of Somerset's eleven deficiencies, both of which pertained to Resident #9's conduct.  The ALJ upheld the deficiencies and CMP award, specifically finding that Somerset failed

to substantially comply with the requirements of 42 C.F.R. §§ 483.13(b) and (c) due to its failure to protect its residents from Resident #9's abuse and failure to implement its anti-abuse policy, respectively. The ALJ also concluded that the immediate jeopardy finding was not clearly erroneous.

The Departmental Appeals Board Appellate Division ("DAB") issued a decision on December 23, 2010 that affirmed the findings and conclusions of the ALJ.

## II.

This Court reviews the imposition of a CMP under a highly deferential standard. *Woodstock Care Ctr. v. Thompson*, 363 F.3d 583, 588 (6th Cir. 2003). The Secretary's factual findings are conclusive "if supported by substantial evidence on the record considered as a whole." *Id.* Substantial evidence review requires an examination of the entire record and taking into account "whatever in the record fairly detracts from the weight of the evidence below." *Claiborne-Hughes Health Ctr. v. Sebelius*, 609 F.3d 839, 843 (6th Cir. 2010). However, such review does not include reviewing the case de novo, resolving conflicts in evidence or deciding questions of credibility. *Id.* The pertinent question is whether "on the record under review, 'it would have been possible for a reasonable jury to reach the Board's conclusion.'" *Id.* (citing *Allentown Mack Sales & Serv. Inc. v. NLRB*, 522 US 359, 366-67 (1998)). "In reviewing the Secretary [of HHS]'s interpretation of regulations, courts may overturn the Secretary's decision only if it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Woodstock Care Ctr.*, 363 F.3d at 588 (internal citations omitted).

## III.

A skilled nursing facility must comply with the requirements set forth in 42 U.S.C. § 1395i-3 and 42 C.F.R. § 483.1 *et seq*., in order to be eligible for reimbursement under the federal Medicare and Medicaid programs. *Claiborne-Hughes*, 609 F.3d at 841. Under 42 C.F.R § 483.13(b), a skilled nursing facility resident "has the right to be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion." The parties do not dispute that the regulations require Somerset to take "reasonable steps to prevent abusive acts." *See Pinehurst Healthcare & Rehab. Ctr. v. CMS*, DAB No. 2246, 2009 WL 1455339 (2009) (quoting *Western Care Mgmt. Corp. v. CMS*, DAB No. 1921, at 12, 2004 WL 1235824 (2004)). The question is whether the actions taken by Somerset to protect its residents from Resident #9 were reasonable.

CMS's Statement of Deficiencies ("SOD") with respect to Somerset's violation of 42 C.F.R. § 483.13(b) states:

> The facility had knowledge since May 10, 2008, that Resident #9 had an ongoing history of exhibiting sexually aggressive behaviors and had attempted to sexually abuse fourteen female residents (five identified residents . . . and nine unidentified). Resident #9 had subjected six of the fourteen female residents to inappropriate sexual contact. Additionally, these sexually aggressive behaviors resulted in three residents . . . exhibiting signs of fear and/or distress. However, there was no evidence the facility implemented safeguards to ensure residents were not further subjected to sexual abuse and were provided protection from Resident #9's sexual aggressive behaviors. Resident #9 continued to move freely throughout the facility until being placed on one-on-one supervision on January 7, 2009. These failures placed female residents in the facility at continued risk for serious physical and mental harm.

DHHS claims that the only reasonable safeguards would have been either one-on-one, or constant line-of-sight, monitoring of Resident #9 by a designated staff member, or earlier discharge of Resident #9 from the facility. Additionally, DHHS contends Somerset should have consulted a physician regarding Resident #9's sexual aggression. In contrast, Somerset claims that it was

7

reasonable to gradually implement more severe intervention methods and initiate discharge proceedings once it became clear that alternate methods would not be effective. Somerset also maintains that a method such as continuous monitoring would be unreasonable as Somerset did not have the resources to implement that measure and was not aware that it would have to do so when it accepted Resident #9 for admission.

Congress uses the outcome-based approach to ensure that facilities receiving federal funds are delivering high-quality care. *Lake Mary Health Care v. CMS*, DAB 2081 (2007). Under this approach, facilities have "flexibility to select the most appropriate methods but the corresponding responsibility to ensure that the selected methods are effective for achieving the outcomes specified in the statute and implementing regulations." *Id.* "[T]he outcome being looked at is the quality of care being provided, not just the health outcome for each resident." *Virginia Highland Health Rehab. Ctr.*, DAB No. 2339 (2010), 2010 WL 4038751 (quoting *Spring Meadows Health Care Ctr. v. Ctrs. for Medicare & Medicaid Servs.,*, DAB No. 1966, at 19 (2005).

There are conflicting decisions by the Departmental Appeals Board about whether an incident of abuse conclusively demonstrates that a facility has not taken reasonable steps to protect its residents. In *Greenery Extended Care Center v. Health Care Financing Administration*, although it was not disputed that the facility "had taken all reasonably appropriate measures to assure that its residents were free from verbal, sexual, physical and mental abuse, corporal punishment and involuntary seclusion," the ALJ upheld a penalty imposed by CMS based on one incident of abuse by a contracted nurse's aide against a resident. DAB CR707 (2000), 2000 WL 1682776. In so doing, the ALJ stated "[o]bviously, where even a single instance of abuse has occurred, the resident's

right to be free from abuse has been violated and, by implication, the facility has not complied with the requirements of 42 C.F.R. § 483.13(b)." *Id.*

Conversely, in *Oakwood Manor Nursing Home v. CMS*, the ALJ disagreed with the *Greenery Extended Care Center* decision and stated "[a]lthough 42 C.F.R. § 483.13(b) states that a resident has a right to be free from abuse, I do not read this to mean that where an isolated instance of abuse has occurred, the facility is automatically deficient under this regulation because a resident's right to be free from abuse has been violated." DAB CR818 (2001), 2001 WL 1172269. Instead, "[a]n occurrence of abuse creates a presumption of noncompliance with the requirements of 42 C.F.R. § 483.13(b) which a facility is obliged to rebut. A facility will rebut that presumption by proving that it did indeed take all necessary steps to prevent the abuse from occurring." *Id.* However, even where there have not been any incidents of abuse, a facility is still deficient "if it either deliberately or negligently acts in some way that presents either actual abuse or the *potential* for abuse." *Id.*

In this case, the ALJ found:

> For a period of several months, Petitioner failed to prevent Resident # 9 from engaging in verbal and physical violence against other residents and from perpetrating sexual abuse against some female residents. The interventions that Petitioner used when Resident #9 engaged in abusive conduct were woefully ineffective in protecting other residents from Resident #9. Petitioner's failure to protect its residents from Resident #9 reveals a fundamental misunderstanding on the part of Petitioner and its staff of the need to take every reasonable measure to protect its residents from abuse. Petitioner's noncompliance, therefore, was not limited just to the way in which its staff dealt with Resident #9 but was a systemic failure by Petitioner and its staff to develop an effective system for dealing with abusive residents.

The ALJ also described Somerset's intervention methods as "halfhearted," "tepid" and "totally inappropriate to the situation."

Given Resident #9's advanced age and health impairments, it may not have been reasonable to require Somerset to implement the most severe intervention methods, such as discharge and constant monitoring, after the first incident when the risk that Resident #9 posed to other residents remained unclear. Throughout May 2008, Somerset instructed its staff to monitor Resident #9, sent him for a psychiatric consultation, sought assistance from Resident #9's family members, and even threatened to discharge him from the facility. In July, 2008, Somerset also commenced limited monitoring in the form of fifteen minute checks of Resident #9, although this was in response to Resident #9 wandering away from the facility, rather than his harassment of the female residents. Somerset's intervention methods appeared to be effective in June and July as the number of incidents involving Resident #9 were significantly reduced, there being a single incident involving only remarks in June, and a single incident while under observation in July.

Nevertheless, after Resident #9 forcefully pinched the breast of another resident in August, it should have been apparent to Somerset that its intervention methods were not completely effective and that its female residents were still at risk of being harmed by Resident #9. Yet, Somerset implemented no additional protections or interventions other than requiring Resident #9 to attend weekly meetings with social services. Although Somerset held an in-service on abuse, there is no indication that event resulted in increased monitoring of Resident #9 or any other action that would protect the female residents from his behavior. Even after the October 16, 2008 incident, when Somerset realized discharge was necessary, it did not take any further action to protect its residents except to reiterate that staff members were supposed to monitor Resident #9. It was not until January 7, 2009, that Somerset finally implemented one-on-one monitoring of Resident #9. As a result of

Somerset's inaction, Resident #9 was able to engage in inappropriate sexual conduct with various residents after August 21, 2008. Accordingly, there is substantial evidence to support the ALJ's and DAB's conclusion that the limited intervention methods employed by Somerset were not reasonable.

**IV.**

Somerset next argues that CMS clearly erred by finding level 4/immediate jeopardy. To warrant a finding of immediate jeopardy, there must exist "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. The CMS guidelines in its State Operations Manual ("SOM") explain that immediate jeopardy exists when there is a "crisis situation in which the health and safety of individual(s) are at risk" or where there is a "high potential" or "likelihood" that non-compliance will cause death or serious harm "in the very near future." State Operations Manual, Chapter 3-Additional Program Activities (Rev. 24, 01-26-07), available at http://cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads //som107c03. pdf., at 38. The SOM also gives examples of "triggers" that "describe situations that will cause the surveyor to consider if further investigation is needed to determine the presence of Immediate Jeopardy." State Operations Manual, Appendix Q- Survey Protocol for Long Term Care Facilities-Part I (Rev. 42, 05-21-04), available at http://cms.gov/Regulations-and-Guidance/Guidance/ Manuals /downloads//som107ap_q_immedjeopardy.pdf., at 4. Among the triggers listed for a "[f]ailure to protect from abuse" finding are "[n]on-consensual sexual interactions; e.g., sexual harassment, sexual coercion or sexual assault." *Id.* at 5.

11

In contrast to level 4/immediate jeopardy, the SOM describes lower level deficiencies in the following manner:

> Level 2 is noncompliance that results in no more than minimal physical, mental and/or psychosocial discomfort to the resident and/or has the potential (not yet realized) to compromise the resident's ability to maintain and/or reach his/her highest practicable physical, mental and/or psychosocial well-being as defined by an accurate and comprehensive resident assessment, plan of care, and provision of services.
>
> Level 3 is noncompliance that results in a negative outcome that has compromised the resident's ability to maintain and/or reach his/her highest practicable physical, mental and psychosocial well-being as defined by an accurate and comprehensive resident assessment, plan of care, and provision of services. This does not include a deficient practice that only could or has caused limited consequence to the resident.

State Operations Manual, Appendix P- Survey Protocol for Long Term Care Facilities-Part I (Rev. 42, 04-24-09), available at http://www/cms.gov/manuals/Downloads/som107ap_p_ltcf.pdf, at 91.[1]

---

[1]Somerset aptly observes that the descriptions of psychosocial outcomes corresponding to the various levels do not support a finding of a level 4/immediate jeopardy deficiency. Examples of negative psychosocial outcomes at level 2 are "[i]ntermittent sadness" reflected in tearfulness and crying, "[f]eelings and/or complaints of discomfort or moderate pain," "[f]eeling of shame or embarrassment without a loss of interest in the environment and the self," "[f]ear/anxiety that may be manifested as expressions or signs of minimal discomfort (e.g., verbal expressions of fear/anxiety; pulling away from a feared object or situation) or has the potential, not yet realized, to compromise the resident's well-being," or "[v]erbal or nonverbal expressions of anger that did not lead to harm to self or others." *Id.* at 98-99. Level 3 negative psychosocial outcomes include "[c]hronic or recurrent fear/aniety that has compromised the resident's well-being and that may be manifested as avoidance of the fear-inducing situation(s) or person(s)," "[a]nger that has caused aggression that could lead to injuring self or others," or a situation where "[p]ain or physical distress has become a central focus of the resident's attention." *Id.* at 97-98. In contrast, examples of negative psychosocial outcomes at level 4 are "[s]uicidal ideation/thoughts and preoccupation," "[e]ngaging in self-injurious behavior that is likely to cause serious injury, harm, impairment, or death to the resident (e.g., banging head against wall)," "[r]ecurrent . . . debilitating fear/anxiety that may be manifested as panic, immobilization, screaming, and/or extremely aggressive or agitated behavior(s) (e.g., trembling, cowering) in response to an identifiable situation (e.g., approach of a specific staff member)," or "[o]ngoing, persistent expression of dehumanization or humiliation in response to an identifiable situation, that persists regardless of whether the precipitating event(s) has ceased and has resulted in a potentially life-threatening consequence." *Id.* at 96.

Although the level 4 psychosocial outcomes do not appear to apply, the administrative

Had Somerset's deficiencies been ascribed a level 2 or 3 rating, the CMP range would have been $50-$3,000, per day, rather than $3,050-$10,000, per day.

Somerset argues that because the intervention methods it implemented to protect other residents from Resident #9, coupled with his physical impairment, significantly reduced the likelihood that another resident would be *seriously* harmed, a lower level deficiency was warranted. We acknowledge that this a close call; one could reasonably conclude that a lesser level of harm was established. However, given Resident #9's persistent conduct and Somerset's failure to implement reasonable intervention methods to protect its female residents from Resident #9's harassing and abusive conduct, especially after August 21, 2008, we cannot say that a finding of likelihood of harm is clearly erroneous. Not only was there a likelihood of serious harm from Resident #9's persistent uninvited sexual advances and increasingly aggressive contact, there was also a likelihood that serious harm would occur from residents attempting to escape Resident #9 in the absence of adequate protection from the nursing staff. Because Somerset failed to adequately protect its extremely vulnerable residents in light of increasing sexual aggressiveness by Resident #9, we must affirm the finding of immediate jeopardy.

**V.**

The question remains whether the Secretary should have imposed a CMP on Somerset as early as May 10, 2008 for the § 483.13(b) deficiency. Somerset argues that if any penalty is assessed

---

findings were not based on psychosocial harms, but, rather, on the likelihood of serious physical or mental injury or harm to a resident.

it should not be until October 16, 2008, when Somerset initiated discharge proceedings against Resident #9.

As discussed above, the record demonstrates that although Somerset could have taken more steps to protect its residents, from May 10 until August 21, 2008 its measures were within the range of reasonable responses to the risk that Resident #9 appeared to pose. However, Somerset's failure to implement more severe intervention methods after August 21, 2008 did create the likelihood of serious harm to its residents until it implemented one-on-one monitoring of Resident #9 on January 7, 2009. Indeed, in the two days following the August 21, 2008 incident, Resident #9 made two more attempts to touch female residents in an inappropriate manner. Though Resident #9 was supposed to be monitored, he was able to slip inside the rooms of female residents unnoticed. In light of Resident #9's increased aggressiveness, the fact that Resident #9 was continuously able to have unmonitored access to the female residents created a likelihood of serious harm that supports CMS's immediate jeopardy finding.[2]

## VI.

The CMP was imposed for a second violation as well—failure to implement an anti-abuse policy in violation of 42 C.F.R. § 483.13(c). In light of our determinations above, the only relevant question is whether a 42 C.F.R. § 483.13(c) deficiency supports a finding of immediate jeopardy prior to August 21, 2008. Only an affirmative answer to that question will further affect the outcome of this appeal. We conclude that CMS clearly erred in finding immediate jeopardy based on

_____

[2]Somerset offers no support for its argument that the failure of the state agency to initiate an investigation upon receiving notice of the August 21, 2008 incident relieved Somerset of the duty to take appropriate steps to protect its residents.

14

Somerset's failure to implement its abuse policy prior to August 21 because there is no indication that this created a likelihood of serious harm to its residents. Although Resident #9 undeniably harassed female residents prior to August 21, whenever the possibility existed that Resident #9 actually touched a resident inappropriately, Somerset interviewed and assessed the resident. Further, there is no indication that Somerset had a pattern of not implementing its abuse policy in other situations. Thus, no 42 C.F.R. § 483.13(c) deficiency supports the imposition of the immediate jeopardy CMP prior to August 21, 2008.

## VII.

In its last claim of error, Somerset argues that the ALJ should have reviewed all the deficiencies cited by CMS, instead of just two, because unaddressed deficiencies damage a facility's reputation. Somerset requests this Court dismiss the unaddressed deficiencies, or, in the alternative, remand to the ALJ for further consideration. However, Somerset's argument is foreclosed by our prior holding in *Claiborne-Hughes* where we acknowledged that:

> The DAB has consistently interpreted the regulations to mean that the ALJ is not mandated to address each and every deficiency found in a survey, and it may choose to address only those deficiencies that have a material impact on the outcome of the dispute . . . It is neither arbitrary nor capricious for the agency to conclude that, in the interests of judicial economy, it will review only those deficiencies that have a material impact on the outcome of the dispute.

609 F.3d at 847.

Accordingly, we will not remand this matter back to the ALJ for further review of the unaddressed deficiencies.

## VIII.

15

For the foregoing reasons, we affirm the deficiency finding for Somerset's violation of 42 C.F.R. § 483.13(b) and the immediate jeopardy finding from August 21, 2008 to January 6, 2009. We reverse the immediate jeopardy finding from May 10, 2008 to August 20, 2008 and January 7, 2009 to January 14, 2009. We remand for further proceedings consistent with this opinion.

**SILER**, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that our standard of review is based upon whether substantial evidence supports the decision of the DAB. *See Claiborne-Hughes Health Center v. Sebelius*, 609 F.3d 839, 843 (6th Cir. 2010). I also concur in Parts V., VI., and VII., which discuss the findings of violations between May 10, 2008, and January 14, 2009.

However, I depart from the majority when it finds that there was sufficient evidence to affirm the deficiency finding for Somerset's violation of 42 C.F.R . § 483.13(b) and the immediate jeopardy finding from August 21, 2008, to January 6, 2009. An "immediate jeopardy" level deficiency is one so egregious that the facility's non-compliance "has caused, or has likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. Although the conduct of Resident #9 is not to be condoned, it must be remembered that he was usually moving around in a wheel chair, although able to walk occasionally.

I do not think that the evidence was sufficient to show that there was a likelihood by Resident #9 to cause serious injury to the other residents, based on the three touching incidents on and after August 21, 2008. The parties have not cited any federal court case which has found that any attempted touching by one patient to another to be a Level 4 "immediate jeopardy." Instead, most of the situations which have been reported concern the failure of the facility to take appropriate steps in the treatment of the residents. For instance, in *Golden Living Center-Frankfort v. Secretary of Health and Human Services*, 656 F.3d 421, 427 (6th Cir. 2011), we upheld the DAB's finding of immediate jeopardy when the facility failed to property treat a resident who developed severe dehydration and other complications. Likewise, in *Claiborne-Hughes*, 609 F.3d at 846, we upheld

17

the finding of immediate jeopardy when the facility failed to notify physicians or family members of a marked decrease in food intake of a diabetic patient. Finally, in *Life Care Ctr. Tullahoma v. Secretary of Health & Human Services*, 453 F. App'x 610, 617 (6th Cir. 2011), we upheld the finding of immediate jeopardy when nurses at the facility failed to notify physicians or the family about the dangerous blood-sugar level of a resident, and the nurses dispensed twice the prescribed amount of medication to the resident. These are just typical factual bases for such findings under Level 4.

On the other hand, I think that Somerset could be found deficient at a lower level, either 2 or 3, for that period of time based upon the definitions of those levels, as set out in the majority opinion, quoting from the State Operations Manual (SOM).

Therefore, I would remand the matter to the DAB in full, to consider whether Somerset should be subject to any penalties under Level 2 or 3 for any dates between May 10, 2008, and January 14, 2009.